# TABLE OF CONTENTS

I.     STATEMENT OF BASIS OF APPELLATE JURISDICTION ............................................... 1

II.    STATEMENT OF ISSUES ............................................................................................... 1

III.   STANDARD OF APPELLATE REVIEW ........................................................................... 2

IV.  STATEMENT OF THE CASE ........................................................................................... 3

     A.    History of the Loan ........................................................................................... 3

     B.    Procedural History of This Case ........................................................................ 3

     C.    The Powells' Earnings Choices ......................................................................... 4

          1.    Mr. Powell Has Not Maximized His Income .......................................... 4

          2.    Mrs. Powell Has Not Maximized Her Income ....................................... 5

     D.    The Powells' Repayment Efforts Towards the Parent PLUS Loan ............................ 7

     E.    The Powells' Spending Choices ........................................................................ 7

          1.    Meals Out ............................................................................................ 8

          2.    Travel ................................................................................................... 8

          3.    Shopping .............................................................................................. 9

          4.    Gambling .............................................................................................. 9

II.    ARGUMENT ................................................................................................................ 11

     F.    The Legal Standard Under *Brunner* .................................................................. 13

G.  The Powells Did Not Meet Their Burden in Proving Prong 1 (That They Cannot Earn MoreIncome Now) or Prong 2 (That They Are Unable to Earn More in the Future) ............................................................................. 14

    1.  The Powells Did Not Prove They Cannot Earn More Income at Present ....................................................................................................... 15

    2.  The Powells Did Not Prove That They Will Not Be Able to Earn More Income in the Future ....................................................... 17

H.  The Powells Did Not Prove Prong 3 (Good Faith Conduct In Past Efforts to Repay Their Loans) ......................................................... 18

    1.  This Prong is Typically Decided By Evaluating Efforts to Maximize Income and Minimize Expenses During the Period of Repayment ............................................................................ 19

    2.  The Powells Did Not Maximize Their Income ................................. 19

    3.  The Powells Did Not Minimize Their Expenses ........................... 20

        a.  Debtors in Repayment Cannot Spend Beyond Bare Necessities (*i.e.* Discretionary Spending) and Then Seek Discharge ....................................................................... 20

        b.  The Powells Spent Considerable Amounts on Discretionary Items During their Period of Repayment (While Not Paying Their Loan Debts) .................................. 21

V.  CONCLUSION ........................................................................................ 23

# TABLE OF AUTHORITIES

**Federal Cases**

*Brunner v. New York State Higher Educ. Servs. Corp.*,
   831 F.2d 395 (2d Cir. 1987) ........................................................................ 1, 2, 13

*Educ. Credit Mgmt. Corp. v. Young*,
   376 B.R. 795 (E.D. Tex. 2007) ..................................................................... 19, 20, 21

*In re Adler*,
   300 B.R. 740 (Bankr. N.D. Cal. 2003) ........................................................ 14

*In re Armstrong*,
   394 B.R. 43 (Bankr. M.D. Pa. 2008) ............................................................ 21

*In re Berchtold*,
   328 B.R. 808 (Bankr. D. Idaho 2005) .......................................................... 19

*In re Brightful*,
   267 F.3d 324 (3d Cir. 2001) ......................................................................... 17

*In re Brunner*,
   46 B.R. 752 (S.D.N.Y. 1985) ....................................................................... 1, 12, 13, 17

*In re Buckland*,
   424 B.R. 883 (Bankr. D. Kan. 2010) ............................................................ 21, 22

*In re Faish*,
   72 F.3d 298 (3d Cir. 1995) ........................................................................... 14

*In re Gibson*,
   428 B.R. 385 (Bankr. W.D. Mich. 2010) ..................................................... 21

*In re Johnson*,
   400 B.R. 167 (Bankr. M.D. Pa. 2009) .......................................................... 20

*In re Mallinckrodt*,
   274 B.R. 560 (S.D. Fla. 2002) ....................................................................... 17

*In re Mason*,
   464 F.3d 878 (9th Cir. 2006) ......................................................................... 19

*In re Matthews*,
   324 B.R. 319 (Bankr. N.D. Ohio 2004) ....................................................... 19

*In re Mosko*,
   515 F.3d 319 (4th Cir. 2008) .................................................................. 19, 21

*In re Naranjo*,
   261 B.R. 248 (Bankr. E.D. Cal. 2001) ......................................................... 14

*In re Nascimento*,
   241 B.R. 440 (B.A.P. 9th Cir. 1999) ...................................................... 15, 16

*In re Nys*,
   446 F.3d 938 (9th Cir. 2006) ......................................................................... 17

*In re Oyler*,
   397 F.3d 382 (6th Cir. 2005) ......................................................................... 19

*In re Pena*,
   155 F.3d 1108 (9th Cir. 1998) ................................................................... 1, 13

*In re Rifino*,
   245 F.3d 1083 (9th Cir. 2001) .............................................................. 2, 3, 14

*In re Saxman*,
   325 F.3d 1168 (9th Cir. 2003) ....................................................................... 14

*In re White*,
   243 B.R. 498 (Bankr. N.D. Ala. 1999) ........................................................ 15

*Tennessee Student Assistance Corp. v. Hood*,
   541 U.S. 440 (2004) ...................................................................................... 13

**Federal Statutes**

11 U.S.C. § 523(a)(8)........................................................................................ 3, 13, 23

28 U.S.C. § 158.................................................................................................... 1, 4

## I.     STATEMENT OF BASIS OF APPELLATE JURISDICTION

On February 28, 2013, the United States Bankruptcy Court for the Western District of Washington entered a Final Order and Judgment discharging all of Plaintiff-Appellee Heidi Powell's student loan debts. [1]  (Dkts. 20 and 21).  Appellant United States Department of Education ("DOE") timely filed a Notice of Appeal and Election to Transfer Appeal to the District Court, pursuant to 28 U.S.C. § 158(c)(1) on March 13, 2013.  (Dkts. 22 and 23).  Accordingly, this Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a).

## II.     STATEMENT OF ISSUES

Mrs. Powell took out the student loans at issue on behalf of her daughter in 2006 when Mrs. Powell was 50 years old.   At that time, Mrs. Powell was already six years unemployed and already allegedly suffering from the same medical condition she complains of today.  Since taking the loan, Mrs. Powell made minimal payments on the debt and then, beginning in 2009, none at all. Nonetheless, Mrs. Powell continued to spend significant amounts of money on discretionary items and activities well beyond the bare necessities of life.  In 2012, the Powells filed for bankruptcy and then filed an adversarial action for discharge of the student loan on the grounds that its repayment is not *now* possible.

These circumstances are fatal to the Powell's ability to prove the good faith element of the *Brunner* undue hardship test for loan dischargeability.  *See In re Brunner*, 46 B.R. 752, 753 (S.D.N.Y. 1985) *aff'd sub nom. Brunner v. New York State Higher Educ. Servs. Cor*p., 831 F.2d 395 (2d Cir. 1987) (adopted by the Ninth Circuit in *In re Pena*, 155 F.3d 1108, 1112 (9th Cir. 1998).  In

---

[1]  The student loans at issue were taken out by Mrs. Heidi Powell.  However, because the earnings of her husband are considered relevant to her eligibility for discharge (*See* Section V.C., *infra*), and because they were both listed as plaintiffs in the adversarial action that is the subject of this appeal, they are referred to collectively throughout, except when reference to one or the other is necessary.

APPELLANT'S BRIEF - 1
(13-CV-0465-JLR)

addition, the Powells failed to prove the first two prongs of the *Brunner* test as set forth below.

Nonetheless, the Bankruptcy Court concluded that the Powells satisfied the *Brunner* test and

discharged all of their approximately $91,000 in student loan debt.  The questions on appeal,

therefore, are:

1.  Did the Bankruptcy Court err in concluding that the Powells satisfied *each* element of the tripartite *Brunner* test for student loan dischargeability, to wit:

    a.  That the Powells cannot maintain, based on current income and expenses, a minimal standard of living for themselves and their dependents if forced to repay the student loan; and

    b.  That additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loan; and,

    c.  That the Powells made a good faith effort to repay the student loan.

2.  Were the Bankruptcy Court's findings of adjudicative fact and corresponding factual inferences grounded in the record evidence or were they clearly erroneous?

### III.    STANDARD OF APPELLATE REVIEW

The Bankruptcy Court's findings of fact are reviewed under a clearly erroneous standard.

*In re Rifino*, 245 F.3d 1083, 1088 (9th Cir. 2001).  However, the Bankruptcy Court's legal

conclusions regarding those facts are reviewed *de novo* by this Court.  *Id.* at 1086-1087.  The

ultimate question of whether repayment of a student loan debt would impose an undue hardship is

also a legal question.  *Id.*  And this Court also reviews *de novo* whether the debtor has provided

sufficient evidence to establish each prong of the *Brunner* test.  *Id.* at 1087-1088.  Thus, this Court

should exercise its independent judgment in assessing whether or not the Powells satisfied their

burden to demonstrate undue hardship, while giving deference only to those findings of fact that are

not clearly erroneous.

APPELLANT'S BRIEF - 2
(13-CV-0465-JLR)

## IV.     STATEMENT OF THE CASE

**A.     <u>History of the Loan</u>**

On July 8, 2006, Heidi Powell signed a Federal Direct Consolidation Loan Web Application and Promissory Note for a Direct Parent Plus Loan for her daughter, Crystal Powell.  (Tr. Ex. D-7), Ex. A.  The loan was taken so that Chrystal could attend Academy Arts University in San Francisco, California where she studied jewelry design.  *See* (Oral Ruling ("OR") at 5).  On July 28, 2006, $68,782.11 was disbursed under that note.  *Id.*  By November 20, 2012, due to interest and Mrs. Powell's failure to make payments on that loan, the total amount due was $91,295.10.  *Id*. at 6.

**B.     <u>Procedural History of This Case</u>**

The Powells filed a Chapter 7 petition for bankruptcy on February 8, 2012.  *See* (Dkt. 13) at 2.  They received their general discharge on May 29, 2012, which included a discharge of over $60,000 in credit card debts.  *Id.*; (Tr.Ex. P-5), Schedule F.  On May 23, 2012, the Powells filed an adversarial action against DOE seeking discharge under 11 U.S.C. § 523(a)(8) of the Parent PLUS student loan debt taken by Mrs. Powell.  (Dkt. 1).  On December 4, 2012, the Bankruptcy Court held a trial on the Powells' request for discharge, as governed by the *Brunner* "undue hardship" standard. The Bankruptcy Court orally announced its conclusion on December 21, 2012, that the Powells met all three prongs of the *Brunner* test. The court also provided its findings of fact and conclusions of law that purportedly supported that decision.  However, they did not.  For purposes of this brief, these findings and conclusions can be grouped into three categories: (1) findings of fact that support a contrary legal conclusion; (2) findings of fact that are not supported by the record; and

1   (3) erroneous conclusions of law.  The first category is included in the fact section set forth herein.

2   The remaining two are addressed in the legal issues discussion at Section V., *infra*.[2]

3   **C.**     **The Powells' Earnings Choices**

4
5         The Powells were 50 years old when Mrs. Powell took out the loan at issue.  (OR at 5).  At

6   that time, Mrs. Powell was not employed.  *Id.*  Nor had she held steady employment for over six

7   years.  At trial, the Powells explained this seemingly risky investment – a debt taken by a person

8   with no income – by explaining that they expected their daughter would pay them the money to

9   make payments on the loan, and if she did not, they anticipated that Mr. Powell's income would

10   afford them the ability to pay off Mrs. Powell's loan.  *See* (Trial Transcript ("TTR") at 61-63).

11
12        **1.**     **Mr. Powell Has Not Maximized His Income**

13         Because Mrs. Powell did not work, the Powells' plan for repayment depended upon

14   Mr. Powell's income.  For years, Mr. Powell made considerable income as a Yellow Page

15   advertising consultant.  For instance, his income from 2006 to 2010 was:

16
17          2006 Income:  $108,904
         2007 Income:  $120,129
18          2008 Income:  $148,639
         2009 Income:  $85,054
19          2010 Income:  $88,141

20   (Dkt. 13), at 3.  However, in 2010, despite earning $88,000/year, Mr. Powell became frustrated with

21   Yellow Book's management and voluntarily terminated his employment to pursue work in alarm

22   installation, a field in which he had no experience or expertise.  *See* (TTR at 63-64).  That year, he

23   made only $54,330.  *Id.*  At the end of 2011, however, Mr. Powell returned to his field of expertise at

24
25

26   [2] The Bankruptcy Court, thereafter, issued an Order and Judgment, memorializing its discharge.  (Dkts. 20
27 and 21).  DOE timely filed a Notice of Appeal and Election to Transfer Appeal to the District Court pursuant
to 28 U.S.C. § 158(c)(1) on March 13, 2013 to challenge these findings of fact and conclusions of law.
28 (Dkts. 22 and 23).

APPELLANT'S BRIEF - 4
(13-CV-0465-JLR)

a similar employer to Yellow Book, called Action Pages.  *Id.*  Since that time, his monthly income has steadily increased.  *See* (Tr.Ex. P-1) (Mr. Powell's Paystubs for 2012) (showing two-week pay periods averaging around $1,000 in the beginning part of the year and averaging around $2,000 in the latter part).  Mr. Powell testified during his deposition that he expected to make $80,000 within two to three years, and at trial, reiterated that his business was growing and he hoped to make that amount within five years.  *See* (TTR at 65-67).  The Bankruptcy Court also found that while Mr. Powell did not retain his client base after quitting Yellow Pages, "he has been slowly rebuilding that base."  (OR at 9); *see also id.* at 10 ("Since joining Action Pages, Mr. Powell's income has continued to increase as he has gradually rebuilt his customer base.").

### 2.    Mrs. Powell Has Not Maximized Her Income

The Powells contend that Mrs. Powell is incapable of working in *any* capacity at *any* type of job due to her mental health issues.   Mrs. Powell classifies these issues as depression, anxiety, and PTSD (as related to an incident in 2001 in which her boss allegedly yelled at her, triggering feelings related to a former husband who was abusive in the 1970s).  *See* (TTR at 92-94).  Mrs. Powell is not on any sort of disability payments, nor has she ever applied for any.  *See* (TTR at 128).  Nor was she regularly treated by a physician for her condition until *after* the filing of the adversary action.  *See* (TTR Cohen at 7) (Dr. Cohen testifying that he began treating Mrs. Powell on September 5, 2012).  Moreover, this recently-visited doctor, repeatedly noted that her anxieties were largely related to the litigation and underlying bankruptcy proceedings.  *Id.* (Tr.Ex. P-7).

- "History of present illness: With recent stressors of filing for bankruptcy (completed 5/2012) and an upcoming federal court date to deal with a federal loan that her daughter took out with the patient's help as a cosigner (unclear situation?) she is having worsening moods and anxiety."
- "Around her financial situation she finds herself becoming depressed."
- "Patient is a 56 year old female with a history of trauma leading to PTSD symptoms and significant anxiety and depressive symptoms related to her current financial condition."

APPELLANT'S BRIEF - 5
(13-CV-0465-JLR)

- "Stressors continue to be financial.  Attempting to have a loan that she co-signed for her daughter let go within her bankruptcy claim."

*Id.*  This was also noted by the Bankruptcy Court: "Dr. Cohen admitted that some of the emotional stress Ms. Powell currently feels is from this litigation."  *See* (OR at 13).[3]

Even if Mrs. Powell's claims regarding mental health issues were legitimate, however, they would not necessarily preclude her from an ability to earn an income.  Indeed, Mrs. Powell's doctor testified that many of his patients with such complaints (anxiety, depression, etc.) are employed. *See* TTR Cohen at 24).  The issue is the specific functionality of each patient.  *Id.*  Mrs. Powell's activities since taking out the student loan clearly demonstrate her degree of functionality.  For instance:

- Elder Care.  Mrs. Powell took care of her elderly parents for seven years (2002-2009). *See* (TTR at 118-119).  "I took care of their needs, their scheduling their doctor's appointments, balancing their checkbook, those types of things.  I took them to the grocery store. . . . I went to the nursing home every day when my mom went there."  *Id.* Mrs. Powell also testified that she took them shopping and to their appointments.  *Id.* at 119.

- Home-Based Business Ventures.  Post-2001, Mrs. Powell pursued business ventures from home. *Id.*  She attempted to sell products in network marketing for Ameriplan, Prostep, and W.D. Powers.  *Id.*  This included making phone calls and sales solicitations to potential customers.  *See Id.* at 122.  Ultimately, these business ventures were not profitable for Mrs. Powell, but not because she was unable to perform the work.  *Id.* at 119, 122.

- Franchising Work.  In 2011, Mrs. Powell participated in the purchase and running of a McGruff franchise (which involved making presentations to schools and parents to sell fingerprinting and similar services to assist in locating missing children).  *See* (TTR at 99) (stating that Mrs. Powell did the "leg work" to set up the franchise, including internet research and interviews); (TTR at 123) (Mrs. Powell describing her role in contacting the

---

[3] Dr. Cohen and the Bankruptcy Court both noted that despite doctor's recommendations, Mrs. Powell has refused to participate in therapy to treat her condition.  *See* (Tr.Ex. P-7) (repeatedly recommending therapy and noting patient non-compliance); (TTR Cohen at 18-20); *see also* (OR at 13) ("Ms. Powell has, however, not resumed that therapy.").  Nor has Mrs. Powell followed doctor's recommendations for her sleep apnea. (TTR Cohen at 20-22) (discussing non-compliance and sleep apnea's contribution to daytime sleepiness).

schools, fingerprinting kids, making ID kits, etc.).  On the basis of this testimony, the Bankruptcy Court found: "Ms. Powell participated in this business by researching the schools where presentations could be made, arranging the presentations and going with her husband to the schools." *See* (OR at 10).  Mrs. Powell also traveled to Florida for training on how to run the franchise.  See (Tr.Ex. D-4), 61-64.

- <u>Travel, Gambling, and Eating Out</u>. *See* Section IV.E., *infra*, discussing Mrs. Powell's active participation in all three.

- <u>Other</u>.  Mrs. Powell also testified that she sews.  *See* (TTR at 130).  She goes dancing. *See Id.*  And she cares for her young granddaughter once a week.  *See Id.*

These activities do not comport with a claim of a total inability to work.[4]

**D.**    **The Powells' Repayment Efforts Towards the Parent PLUS Loan**

From 2007 to 2012, the Powells only made payments on the loan for 17 months: from August 27, 2007 to December 27, 2008, for a total of $6,341.68.  (Tr.Ex. D-7), Ex. B.  A number of these payments were actually made using disbursements from the loan itself.  *See* (TTR at 115) (testifying that instead of using portions of the loan intended to assist with their daughter's living expenses, the Powells used it to make payments on that loan).   Since the beginning of 2009, the loans have been in forbearance or simply unpaid by the Powells.  *See* (OR at 14) (establishing the period of forbearance as January 28, 2009 to January 28, 2010); (Tr.Ex. D-7, Exhibit B) (DOE payment history record, showing payments stopping in December 2008).

**E.**    **The Powells' Spending Choices**

During the period after taking out the loan from DOE, and in particular, the years in which the Powells were not making payments on those loans, the Powells choose to spend their money on discretionary expenses:

---

[4] Also, notably, no doctor has ever recommended that Ms. Powell not work, including Dr. Cohen.  *See* (TTR Cohen at 25) ("you have not advised Mrs. Powell to not try to work?  In other words, it's not one of your recommendations, that she should avoid work?" "No, that is not one of my recommendations.").

APPELLANT'S BRIEF - 7
(13-CV-0465-JLR)

1.     **Meals Out**

The Powells provided thousands of pages of bank statements and credit card statements in discovery.  *See* (Tr.Ex. D-9) (disk containing complete set of produced materials).  In preparation for trial, DOE compiled Exhibit D-3, which reflected a selection of bank statements from 2010-2012.  *See* (Tr.Ex. D-3).  As explained to the Court, the exhibit was highlighted to demonstrate all meal purchases under $10.  *See* (TTR 128-129).  The $10 minimum was set in order to exclude meals Mr. Powell had during the day during the course of his business travels.[5]  *Id.*  Thus, the highlighted charges only reflect non-business meals out eaten by Mr. and Mrs. Powell.  *See* (TTR at 128) (testifying that she and her husband ate/eat out a couple of times per week).  These meals out add up.  As reflected by these bank statements, the Powells spent over $10,000 eating out in 2010 alone, and considerable amounts during other years of repayment.  *See* (Tr.Ex. D-3); *see also* Exhibit A (bank statement demonstrative).  Notably, 2010 was a year in which they made no payments on their student loan debt.

2.     **Travel**

In December 2008, days before seeking and obtaining forbearance on their loans from DOE, the Powells took a leisure trip to Victoria, British Columbia.  The trip was not only a vacation for the Powells; they also fully treated their daughter and her husband.  *See* (TTR at 73).  Credit card records reflect that the total cost of the trip, including tourist attractions and hotel was over $900.  *See* (OR at 17); (TTR at 72-74) (Mr. Powell's testimony); (Tr.Ex. D-4 at 45-46) (credit card statements).  The next month, the Powells stopped making payments on their loan and then filed for forbearance based upon "economic hardship."  (OR at 5 and 14); (Tr.Ex. D-10).

---

[5] Mr. Powell's business takes him on day trips around the local region. *See* (TTR at 43) ("I service all of Whatcom County, all of Skagit County.  That includes Anacortes.  I also go down to Oak Harbor, Coupville, and the San Juan Islands.").

APPELLANT'S BRIEF - 8
(13-CV-0465-JLR)

1    In the year that their loans were in forbearance, the Powells continued to take leisure trips

2  and pay other discretionary travel expenses.   In July 2009, they paid to fly their daughter from

3  Denver to Seattle.  *See* (TTR at 74) and (Tr.Ex. D-4), 53.  In November 2009, the Powells took a

4  vacation to Las Vegas in which they stayed at the Venetian (a five-star hotel), rented a car, saw a

5  $250 show, ate at restaurants, and gambled.  Credit card records reflect that the total cost of that trip

6  was over $2,000.  *See* (OR at 17); (TTR at 74-77) (Mr. Powell's testimony); and (Tr.Ex. D-4), 57-59

7  (credit card statements).  And finally, the Powells spent over $1,500 on a trip to Florida, as part of

8  their failed business venture in McGruff franchising.  *See* (OR at 17); (TTR at 77-79) (Mr. Powell's

9

10  testimony); and (Tr.Ex. D-4), 61-64 (credit card statements).

11

12    **3.    Shopping**

13    While the loan was in its repayment period, the Powells spent considerable amounts on

14  shopping as well.  *See* (Tr.Ex. D-9) (disk of bank statements and credit cards); *see also* (Tr.Ex. D-8)

15  (statements from JCPenny and Macy's).  Of particular note is the fact that post-2008, when the

16  Powells had stopped making payments on their loans, they still shopped frequently at JCPenny and

17  Macy's and made payments on those credit cards.  *See*, *e.g*., (Tr.Ex. D-8) at 16-24 (showing

18

19  purchases and payments on the card in 2009, including one payment for $1,700).

20    **4.    Gambling**

21    The Powells have engaged in gambling during their repayment period, again including

22  during the time period since they ceased making payments on their student loan.  Some of this

23  gambling was admitted in trial testimony, while the rest was contested by the Powells, but

24  established by the evidence in the record.  For instance, the Powells' bank statements from 2010 to

25  2012 reflect that the Powells still routinely visited Slo-Pitch Pub and Casino and Silver Reef Casino.

26

27  *See* (Tr. Ex. D-3).  In fact, the Powells visited them at least <u>45 times</u> in 2010.  *Id*. (per their bank

28

APPELLANT'S BRIEF - 9
(13-CV-0465-JLR)

statements).  Mrs. Powell denies that she and Mr. Powell gamble at these casinos.  *See* (TTR at 134) (stating that they eat out at these casinos and visit with friends).  However, there is no question that the Powells have gambled there in the past.  Mrs. Powell testified that she reported gambling winnings from Slo-Pitch Pub and Casino in 2005.  *See* (TTR at 132); (Tr. Ex. D-1) (W-2G reflecting winnings).  And Mrs. Powell testified that Mr. Powell reported gambling winnings from Silver Reef Casino in 2008.  *See* (TTR at 132-133); (Tr. Ex. D-2) (W2-G reflecting winnings).  Mrs. Powell also admits that around the time of taking out the student loan, she was playing in poker tournaments.  *See* (TTR at 138-39) (stating that she *began* playing in them in 2005).

The circumstantial evidence shows that the gambling has continued.  Between 2006 and 2011, the Powells' credit card statements not only show money spent at the same two casinos, but also show large ATM cash withdrawals at those locations, on those same dates.  *See*, *e.g.*, (Tr.Ex. D-4) (Alaska Airlines Credit Card Statements).  *For example*:

1.  January 30, 2008: An entry for Silver Reef Casino in Ferndale, WA.  *Id.* at 30.  And an entry for ATM withdrawals from a Ferndale WA ATM for $400.  *Id.* at 29.

2.  April 27, 2008: An entry for Silver Reef Casino in Ferndale, WA.  *Id.* at 33.  And an entry for an ATM withdrawal from a Ferndale WA ATM for $200.  *Id.* at 34.

3.  November 19, 2008: An entry for $200 taken with the notation "ATM Transaction, Slo Pitch." *Id.* at 41.

4.  November 20, 2008:  An entry for $200 taken with the notation "ATM Transaction, Slo Pitch." *Id.* at 41.

5.  November 24, 2008:  An entry for $100 taken with the notation "ATM Transaction, Slo Pitch." *Id.* at 42.

6.  November 26, 2008:  Two $100 entries taken with the notation "ATM Transaction, Slo Pitch." *Id.* at 42.

These examples were noted to the Bankruptcy Court in closing argument.  *See* (TTR at 174-175).

There are also other examples from other years.  When the Powells visited Las Vegas in 2009 (while

APPELLANT'S BRIEF - 10
(13-CV-0465-JLR)

the loan was in forbearance for "economic hardship"), the Powells' credit card statement shows a $400 ATM withdrawal from Caesar's Palace and another ATM withdrawal for $400 from The Orleans Casino, Las Vegas. *See* (Tr.Ex. D-4), 57 and 59. Likewise, in 2010, entries for Slo-Pitch Pub and Casino align with ATM cash withdrawals. *See, e.g.,* (Tr.Ex. D-3), at 1 (December 20, 2010 charge to Slo Pitch and December 20, 2010 ATM withdrawal for $320).[6] These incidents provide strong evidence that the Powells have continued to gamble well into the period of their loan repayment obligations.

## II.     ARGUMENT

### A.     Summary of Argument

Student loans are unique from other types of loans in large part because they are made without security. Rather, the loans are made contingent only on the debtor's good faith attempts to earn income and repay the loans. In turn, the student loan system depends on those repayment efforts to replenish the system and give the next set of needy and deserving students the same security-less loans and opportunities for a better future.

In the light of these goals and the risk associated with the student loan system, Congress expressly exempted student loan debts from bankruptcy discharge. Since doing so, courts have created a narrow exception to non-dischargeability, known as the *Brunner* test. Under *Brunner*, debtors must prove each of three elements in order to excuse the repayment of their loan, namely: (1) a present inability to pay back the loans; (2) a future inability to pay back the loans; and (3) good faith efforts during the repayment period to date to minimize expenses and maximize income in

---

[6] There are also a substantial number of cash transfers reflected in the Powells' bank records. *See, e.g.,* (Tr.Ex. D-3), 8 (showing transfers of $2,500) and *Id.* at 138 (showing transfers of $1,800). These transfers underscore the fact that the evidence presented is limited to the paper trail of the Powells' spending. Further spending certainly occurred without record.

APPELLANT'S BRIEF - 11
(13-CV-0465-JLR)

order to be able to continue to repay the loans.  *In re Brunner*, 46 B.R. at 753.  If and only if debtors can show all three temporally distinct elements, are they are eligible for discharge.

In the instant case, the Bankruptcy Court focused almost exclusively on the Powells' current ability to pay without giving adequate, corresponding consideration of the choices the debtors made that lead them to their current difficulties.  Should this Court adopt the Bankruptcy Court's ruling (and its seemingly singular focus on debtors' current finances), it risks setting a precedent for future debtors that if they choose to spend their money on discretionary items instead of their student loans, even for years at a time, the courts will still discharge their responsibilities to pay back their loans.  The student loan system could not function if such a rule were in place.  The Court must uphold the rule that debtors must act responsibly towards their loan obligations and be excused only when repayment is not possible *despite* genuine efforts.

The Powells did not and cannot demonstrate good faith efforts at repayment.  Their discretionary spending during the repayment period went well beyond the "bare necessities" standard imposed by the law.  Moreover, from 2009 to 2012, the Powells spent significant amounts on travel, shopping, and eating out, but spent no money whatsoever repaying their loans.  Their claim for discharge fails on this element alone.

The Powells' claim for discharge also fails due to the other two prongs of the *Brunner* test (current and future ability to pay).  Mrs. Powell has demonstrated an ability to perform employable skills now and in the future.  And Mr. Powell has been, and will continue to, increase his income.  For these three, independent reasons, the Bankruptcy Court's decision to discharge the loans in full was in error and should be reversed on any one of those grounds.

APPELLANT'S BRIEF - 12
(13-CV-0465-JLR)

**F.**     <u>**The Legal Standard Under *Brunner***</u>

Student loans are presumptively non-dischargeable in bankruptcy.  11 U.S.C. § 523(a)(8);

*see also Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440, 450 (2004).  Section 523(a)(8)

provides that a debtor may obtain a discharge if he can establish that requiring him to repay his

student loans would impose an "undue hardship" on the debtor.  11 U.S.C. § 523(a)(8).

To determine if a debtor has established "undue hardship," the Ninth Circuit, like the vast

majority of circuits, applies the three-pronged test originally enunciated in *Brunner v. New York*

*State Higher Educ. Servs. Corp.*, 831 F.2d 395 (2d Cir. 1987).  *See In re Pena*, 155 F.3d at

1111(adopting *Brunner* as the undue hardship standard for the Ninth Circuit).  Under *Brunner*, the

debtor must prove that

    (1)     he cannot maintain, based on current income and expenses, a "minimal"
             standard of living for himself and his dependents if forced to repay the
             loans;

    (2)     additional circumstances exist indicating that this state of affairs is likely
             to persist for a significant portion of the repayment period of the student
             loans; and

    (3)     he has made good faith efforts to repay the loans.

*In re Pena*, 155 F.3d at 1111.

The "existence of the adjective 'undue' indicates that Congress viewed garden-variety

hardship as insufficient excuse for a discharge of student loans."  *In re Pena*, 155 F.3d at

1111(quoting *In re Brunner*, 46 B.R. at 753, which stated that the undue hardship requirement

"strips these individuals of the refuge of bankruptcy in all but extreme circumstances").  As one

court has put it:

> It seems universally accepted that "undue hardship" contemplates unique and extraordinary circumstances. <u>Mere financial adversity is insufficient, for that is the basis of all petitions in bankruptcy.</u>

*In re Naranjo*, 261 B.R. 248 (Bankr. E.D. Cal. 2001)(emphasis added). The burden of proving undue hardship is on the debtor and, "[i]f the debtor fails to satisfy any one of these requirements, 'the bankruptcy court's inquiry must end there, with a finding of no dischargeability.'" *In re Rifino*, 245 F.3d at 1088(quoting *In re Faish*, 72 F.3d 298, 306 (3d Cir. 1995)). Specifically, it is incumbent upon the debtor to present evidence of facts supporting each element of the *Brunner* test by a preponderance of the evidence. *Rifino,* 245 F.3d at1088. Failure to meet prove any individual element is fatal to the claim of undue hardship. *In re Saxman*, 325 F.3d 1168 (9th Cir. 2003). Because the Powells did not meet their burden in establishing *any* of the three prongs, they were not entitled to a discharge.

**G.    <u>The Powells Did Not Meet Their Burden in Proving Prong 1 (That They Cannot Earn MoreIncome Now) or Prong 2 (That They Are Unable to Earn More in the Future)</u>**

Although Mrs. Powell was the person who signed the promissory note for the loan, the income of all people in the household is considered relevant to the "undue hardship" assessment. *See In re Adler*, 300 B.R. 740, 749 (Bankr. N.D. Cal. 2003)("It is undisputed that all family or household income must be included when assessing undue hardship under § 523(a)(8)") (citing *Pena*, 155 F.3d at 1110 (which discussed both spouses incomes in evaluating discharge of a loan taken by only one). Indeed:

> Courts have routinely considered the income of a debtor's spouse when determining whether the debtor's household income and expenses are in such a dire condition that a discharge of student loans is warranted. In fact, the vast majority of the reported opinions in which the dischargeability of a student loan debt owed by a married debtor was at issue, the courts have considered the earnings of both the debtor and his or her spouse for the purpose of evaluating the quality of the debtor's lifestyle.

APPELLANT'S BRIEF - 14
(13-CV-0465-JLR)

*In re White*, 243 B.R. 498, 509 (Bankr. N.D. Ala. 1999)(internal citations omitted).  Accordingly, Mr. Powell's income is also discussed and the earnings or potential earnings of both of the Powells are appropriately considered.

### 1.      The Powells Did Not Prove They Cannot Earn More Income at Present

Under Prong One of the *Brunner* test, "the proper inquiry is whether it would be 'unconscionable' to require the Debtor to take steps to earn more income."  *In re Nascimento*, 241 B.R. 440, 445 (B.A.P. 9th Cir. 1999).  Accordingly, the Powells are required to demonstrate that it would be "unconscionable" to require them to take steps to earn more income and reduce their expenses.  *Id.*

The Powells' current income is reported as $3,547/month and their current expenses as $4,488.48.  *See* (Tr.Ex. P-6) (Schedules I and J).[7]  Currently, Mr. Powell is the only spouse bringing in income.  *See* (Tr.Ex. P-6).  The Bankruptcy Court concluded that the Powells cannot currently earn more than Mr. Powell's current income because: "Since 2001, Mrs. Powell has not been able to work."  *See* (OR at 12).  And held: "Mrs. Powell will not be able to work." (OR at 20, 22) (because of her "mental disabilities").  These conclusions were clearly erroneous.

"As a general rule, psychological impairment must be an impairment to work -- that is to say, an impairment to do <u>any</u> kind of work, even work outside of the debtor's chosen field."  *United Student Aid Funds v. Paolini (In re Paolini)*, 1997 U.S. App. LEXIS 22454, *12-13 (6th Cir. Ohio Aug. 19, 1997) ("It is not the fact of physical or mental condition that is critical, but rather the effect that condition has upon the debtor's ability to obtain and maintain adequate financial resources during the foreseeable future") (internal citations omitted, emphasis added).  Thus, even if

---

[7] For purposes of this appeal, the reasonableness of their current expenses is not addressed.

APPELLANT'S BRIEF - 15
(13-CV-0465-JLR)

1  Mrs. Powell suffered from anxiety and depression, she would still need to demonstrate that such

2  conditions undermined her ability to conduct *any* employable work.

3      Mrs. Powell did not and cannot meet this burden of proof.   At trial, Mrs. Powell's doctor

4  testified, people with anxiety and depression are frequently capable of working.  (TTR Cohen at 24).

5  The issue is simply the capacity of the individual at issue.  *Id.*  And, indeed, Mrs. Powell has worked

6  since 2001 (the date of her alleged traumatic experience with her former employer).  Mrs. Powell

7  engaged in work-from-home enterprises, was highly involved in operating the McGruff franchise,

8  and conducted other work-like engagements, such as caring for her parents for seven years.  *See*

9  Section IV.C.2, *supra*.  Furthermore, Mrs. Powell's various leisure activities undermine the clearly

10

11  erroneous finding that she is disabled to the point of possessing no employable skills.  *See*, *e.g.*,

12  Section IV.E., *supra* (showing significant participation in travel, shopping, and eating out).

13

14      The Bankruptcy Court dismissed these activities by stating: "DOE attempts to rebut this

15  evidence [that Mrs. Powell is disabled to the point where she can do no work] by arguing that Mrs.

16  Powell engages in lots of normal activities, such as . . . 'sewing, dancing, gambling, traveling, dining

17  out, elder care, child care, and pursuing entrepreneurial ventures.'  But I think this is an exaggeration

18  of the evidence."  *See* (OR at 20-21).  This finding is contrary to Mrs. Powell's own testimony and

19

20  the exhibits in evidence, which show that Mrs. Powell <u>did</u> and <u>does</u> engage in those very activities.

21  *See*, *e.g.*, (TTR 118-123; 130).

22

23      Accordingly, the Trial Court's conclusion that Mrs. Powell is disabled to the point of not

24  being able to do any work (*see* OR at 22) is unsupported and clear error.  In reality, and in light of

25  Mrs. Powell's life activities, it would not be "unconscionable" to require Mrs. Powell to seek some

26  form of employment at present.  Accordingly, the Powells *can* earn additional income and the

27

28  Bankruptcy Court's decision is reversible on this ground.

APPELLANT'S BRIEF - 16
(13-CV-0465-JLR)

1

## 2. The Powells Did Not Prove That They Will Not Be Able to Earn More Income in the Future

2

3       Under Prong Two of the *Brunner* test, a court is required to determine not only whether the

4  debtor can repay his debts in the future, but also whether there are additional circumstances that

5  prevent such repayment for reasons not within his or her control.  *In re Brunner*, 46 B.R. at 758.

6  "[T]he burden is on the debtor to provide the court with additional circumstances, *i.e.*,

7  'circumstances, beyond the mere current inability to pay, that show that the inability to pay is likely

8  to persist for a significant portion of the repayment period.'"  *In re Nys*, 446 F.3d 938, 946 (9th Cir.

9  2006).  (internal citations omitted).  The debtor must "demonstrate insurmountable barriers to [his]

10 financial recovery and ability to pay."  *Id.*(internal citations omitted).  "What separates a 'garden-

11 variety debtor' from a debtor who can show 'undue hardship' is the realistic possibility that a

12 'garden-variety debtor' could improve [his] financial situation in the future."  *Id.* at 944.  As a

13 district court in Florida stated:

14

15
>       As [the student loan creditors] point out, however, it is not for them to
>       show that Mallinckrodt will earn more money.  Mallinckrodt has the
>       burden to prove that he *cannot* earn more money in the years to come. . .
>       Here, Mallinckrodt has only proved that he has earned insufficient
>       income up until now.

16

17

18

19 *In re Mallinckrodt*, 274 B.R. 560, 567 (S.D. Fla. 2002) (italics in original, underline added).

20 Moreover, the inability to earn more money must be entirely outside of the debtor's control.  *In re*

21 *Brightful*, 267 F.3d 324, 328 (3d Cir. 2001)("it is not enough for Brightful to demonstrate that she is

22 currently in financial straits; rather, she must prove a total incapacity . . . in the future to pay her

23 debts for reasons not within her control") (internal quotations omitted).

24      The Bankruptcy Court found this prong had been satisfied because "Mr. Powell has

25 maximized his earnings" (OR at 21); *see also* (OR at 22) ("Mr. Powell has maximized his earning

26 potential.").  However, this finding is clearly erroneous in light of the facts that:

27

28

APPELLANT'S BRIEF - 17
(13-CV-0465-JLR)

(1)     Mr. Powell's income dropped because of his voluntary departure from his field of Expertise (TTR at 63-64);

(2)     the documented increase in his income since he returned to his field of expertise (Tr. Ex. P-1);

(3)     the Court's own language recognizing his "continued" increase in business since that time (OR at 9, 10); and

(4)     Mr. Powell's own testimony regarding his expectation to increase his income (TTR 65-67).

Thus, the Bankruptcy Court's finding that the debtors satisfied prong two was based upon clear factual error.  Mr. Powell not only can increase his income in the future, but he already is doing so.  Thus, the Powells have not and cannot demonstrate that their current inability to pay is going to persist through the repayment period.  The decision is additionally reversible on this ground. [8]

**H.     The Powells Did Not Prove Prong 3 (Good Faith Conduct In Past Efforts to Repay Their Loans)**

The evaluation of "good faith" is a backwards-looking examination of what the debtors did to find themselves in the financial hardship from which they seeks relief.  *In re Robinson*, 390 B.R. 727, 732 (Bankr. W.D. Okla. 2008)("a court should review the steps taken by the debtor prior to filing for bankruptcy in determining whether the debtor was acting in good faith").  This inquiry is one of equity.  *See In re Matthews*, 324 B.R. 319, 323 (Bankr. N.D. Ohio 2004).  Under this prong,

---

[8] It is unclear whether or not the Bankruptcy Court relied upon the Powells' age as a factor in this analysis.  *See* (OR at 22) (Noting: "They aren't getting any younger.")  In any event, this Court should not.  As the court in *In re: Robinson* noted, the fact that a debtor was going to be paying off their loan until the age of eighty "is simply a function of the plaintiff's age at the time she obtained her degrees and executed the Consolidation Note and her exercise of forbearances prior to filing her bankruptcy case."  *In re Robinson*, 390 B.R., 733; *see also In re Jones*, 392 B.R., 129(holding that debtor could not use age as a grounds for discharge when debtor took on the loans late in life).  Likewise, the Powells' current age (56) is a product of the age at which they took the loan (50) and their non-payment of the loan since that time.  Thus, this Court should not consider it in evaluating discharge.

"a <u>debtor may not 'willfully or negligently cause his own default, but rather his condition must result from factors beyond his reasonable control.</u>'"  *In re Mosko*, 515 F.3d 319, 324 (4th Cir. 2008)(emphasis added); *see also In re Jones*, 392 B.R. 116, 130 (Bankr. E.D. Pa. 2008)("Fundamental to the good faith inquiry is the notion that the debtor did not willfully or negligently cause his own default but that his condition results from factors beyond his control").

### 1. This Prong is Typically Decided By Evaluating Efforts to Maximize Income and Minimize Expenses During the Period of Repayment

Courts typically evaluate the debtor's efforts in this regard by looking to whether debtors maximized their income and minimized their expenses.  *See In re Jones*, 392 B.R. at 116("A debtor's good faith may be measured by his efforts to obtain employment, maximize income, and minimize expenses"); *see also In re Mason*, 464 F.3d 878, 885 (9th Cir. 2006)(evaluating good faith by whether the debtor maximized income and minimized expenses).   "If Debtor is capable of working more but is not, he is voluntarily under-employed and he has not displayed good faith in dealing with his financial obligations to defendant."  *In re Berchtold*, 328 B.R. 808, 817 (Bankr. D. Idaho 2005)(citing *In re Oyler*, 397 F.3d 382, 385 (6th Cir. 2005)).  Similarly, a debtor's failure to minimize expenses is fatal to the good faith analysis.  *Educ. Credit Mgmt. Corp. v. Young*, 376 B.R. 795, 800 (E.D. Tex. 2007).  Here, it is clear that the Powells current inability to pay is not the result of factors beyond their control, but rather is the result of their willful failure to maximize income and minimize expenses.

### 2. The Powells Did Not Maximize Their Income

As discussed in detail in Section V.C., *supra*, the Powells have not maximized their income. Rather, Mr. Powell voluntarily left a good paying job that enabled him to make payments on the student loan, for a job that did not allow him to do so.  *See* Section V.C.  In addition, Mrs. Powell is

APPELLANT'S BRIEF - 19
(13-CV-0465-JLR)

and has been willfully underemployed. [9] *Id.* These choices are not beyond the Powells' control and have directly contributed to their current inability to repay.

### 3.   The Powells Did Not Minimize Their Expenses

a.   Debtors in Repayment Cannot Spend Beyond Bare Necessities (*i.e.* Discretionary Spending) and Then Seek Discharge

This element of the good faith analysis can also be stated as "whether the debtor incurred substantial expenses beyond those required to pay for <u>basic necessities</u>." *In re Jones*, 392 B.R. at 130(emphasis added); *see also In re Johnson*, 400 B.R. 167, 173 (Bankr. M.D. Pa. 2009) ("After providing for his or her basic needs, a debtor may not use her or her financial resources for discretionary expenditures in lieu of repaying student loan creditors.")

> When inquiring whether a debtor has made a good faith effort to repay a student loan, a bankruptcy court must consider . . . 'whether the debtor incurred substantial expenses beyond those required to pay for basic necessities. . . .' As the Factual Findings indicate, <u>Debtor made many discretionary purchases while refusing to make a single payment on her student loans</u>. In calendar year 2007 alone, she expended approximately $331.00 for manicures. She incurred charges in that same period totaling over $1,472.00 for her family and friends to dine out. Debtor spent at least $868.00 in 2007 for non-essential items such as video games, fireworks, movies, music and sporting goods. Had these expenditures been made at a time when Debtor was also attempting to make some payments on her educational loans, they might be overlooked. However, . . . Debtor made a conscious decision to ignore her student loan debts in favor of making consumer purchases for the benefit of herself and her children.

*In re Armstrong*, 394 B.R. 43, 51 (Bankr. M.D. Pa. 2008)(internal citations omitted, emphasis added).

Impermissible discretionary spending includes:

---

[9] The fact that Mrs. Powell did not seek treatment for her purported mental conditions until after her filing of the adversary case, and the fact that she has not followed doctor's advice regarding treatment for her condition(s) (*See* Section IV.C.2.), further undermines her claims of good faith attempts to maximize income.

APPELLANT'S BRIEF - 20
(13-CV-0465-JLR)

○ <u>Eating Out</u>. Debtors cannot spent considerable amounts eating out at restaurants during their period of repayment and then seek discharge of their student loan debts. For example, one court held:

"Debtor also has failed to minimize his expenditures with regard to food. Debtor spends approximately $650 each month on food for his son and himself. Contributing to Debtor's food expenses is his penchant for eating out . . . <u>Debtor's monthly food expenses indicate a failure to minimize expenses consistent with a showing of good faith under the *Brunner* analysis.</u>" *Educ. Credit Mgmt. Corp.*, 376 B.R. at 800(emphasis added).

○ <u>Gambling</u>.  Likewise, gambling is discretionary spending that moots a good faith claim.  *See In re Gibson*, 428 B.R. 385, 390 (Bankr. W.D. Mich. 2010)(finding a lack of good faith, in part due to $120 in expenditures at casinos and on lottery tickets).

Discretionary spending particularly undermines a claim of good faith when debtors otherwise would have had the ability to make payments on their loans.  *See In re Mosko*, 515 F.3d at 326(holding that the failure to make payments during a time when income exceeded expenses did not demonstrate good faith treatment of the loan); *see also In re Buckland*, 424 B.R. 883, 893 (Bankr. D. Kan. 2010)("to support a finding of a lack of good faith, [failure to make payments] is a relevant factor for the Court to consider, especially when no payments were made during a time in which Debtors were both employed and had steady income").

  b.  The Powells Spent Considerable Amounts on Discretionary Items During their Period of Repayment (While Not Paying Their Loan Debts)

There is no question that the Powells did not limit their spending during their period of repayment to bare necessities.  Rather, even during the years in which the Powells were making zero payments on their student loan debts, they spent considerable amounts on unquestionably discretionary items.  *See* Section IV.E. (detailing gambling, eating out, shopping, and travel expenses).  While Section IV.E. as a whole and Tr.Exs. D-3, D-4, D-8 and D-9 demonstrate the Powells' spending on non-necessities, certain choices that they made are particularly notable to the good faith legal standard.  For instance:

APPELLANT'S BRIEF - 21
(13-CV-0465-JLR)

- In the 65 months from August 2007 to December 2012, the Powells made only 17 months of minimum payments on the loan at issue. (Tr.Ex. D-7), Ex. B (August 27, 2007 to December 27, 2008). A number of these payments were actually made using disbursements from the loan itself. See (TTR at 115). As of January 2009, the Powells completely stopped making any payments on the loan and have not made any payments since. See (Tr.Ex. D-7), Ex. B.

- After receiving forbearance for "economic hardship", the Powells spent $2,000+ on a vacation in Las Vegas that same year. See (OR at 17); (TTR at 74-77) ; (Tr.Ex. D-4), 57-59. Mr. Powell made $85,054 that year. (Dkt. 13), at 3. Absent these discretionary expenditures, the Powells could have made payments on their student loans.

- Likewise, in 2010, Mr. Powell made $88,141. Id. But that year, the Powells spent over $10,000 eating at restaurants and visited casinos over 45 times. See (Tr.Ex. D-3); and Exhibit A.

  Notably, the Bankruptcy Court erroneously read Exhibit D-3 to reflect all meals eaten out by the Powells, including Mr. Powell's work lunches. See (OR at 16) ("The spreadsheet includes those expenses highlighted in yellow in Exhibit D-3, which appear to be meals out or expenses made at casinos."). However, as noted, those travel expenses lunches were expressly excluded from Exhibit D-3s highlighted demonstrative. Thus, the court's conclusions about the appropriateness of that spending was based on clear (though presumably inadvertent) error. In reality, the totals referenced above had nothing to do with Mr. Powell's business expenses and should have been considered in evaluating the Powell's claim of good faith.

- During the period of repayment, the Powells also continued to gamble. See Section IV. E.3, supra.

  The Bankruptcy Court erroneously interpreted this evidence. It held: "There's no question that the Powells have done some betting at these casinos . . . But I don't find any real evidence of gambling after 2008, and there's no evidence of any big gambling losses." (OR at 24). This finding is clear error in light of:

  (1)    The facts in the record that provide strong circumstantial evidence that the Powells, despite claiming a failure to pay any money at all on their student loan debt, continued to gamble, and frequently;

  (2)    The Powells admit to gambling since 2008 (TTR at 132); and

  (3)    The fact that gambling losses would neither be reported nor appear on the credit card or bank statements of the Powells. In fact, the Powells' use of credit cards to advance money at casinos, followed by their significant credit card debt (discharged in bankruptcy) is at the very least, consistent with

gambling losses rather than gains.  *See* (Tr.Ex. P-5) (discharging over $60,000 in credit card debts).

The Powells spent this money on these activities all while failing to make any repayments on the loan.  These choices – to spend money on discretionary items instead of student loan repayment – simply cannot support a finding of good faith repayment.  Thus, the Powells cannot meet their burden to prove this element and their justification for discharge under *Brunner*, therefore, fails on this independent ground as well.

## V.    CONCLUSION

Congress intentionally made student loans ordinarily non-dischargeable in bankruptcy.  11 U.S.C. § 523(a)(8).  Forgiveness of student loans is permitted only where debtors establish all three prongs of the *Brunner* undue hardship test.   This high bar was designed to make student loans resistant to discharge, in part, so that student loans could be obtained without collateral, and solely on the good faith of borrowers.  But in order for the *Brunner* test to ensure this result, courts must hold debtors its strict burden of proof.  Here, notwithstanding the contrary finding of the Bankruptcy Court, the Powells objectively did not and cannot satisfy any of the three prongs, let alone all three.  The choices the Powells made leading up to their bankruptcy completely undermine a finding of good faith treatment of their loan.  Moreover, Mrs. Powell is currently capable of contributing some income and Mr. Powell is and almost certainly will continue to increase his earnings.  Under these circumstances, the Bankruptcy Court's order for full discharge of the loan was clearly erroneous.

DOE takes this rare appeal from the Bankruptcy Court's decision to protect not only the funds DOE advanced to the Powells in this instance, but also to protect the student loan system from a precedent that would undermine DOE's ability to ensure that adequate loan proceeds exist in the

APPELLANT'S BRIEF - 23
(13-CV-0465-JLR)

future for eligible and deserving students.  For the foregoing reasons, DOE respectfully asks this

Court to reverse the Bankruptcy Court's decision and hold the loans at issue non-dischargeable.

DATED this 17th day of June, 2013.

JENNY A. DURKAN
United States Attorney


*/S/  Christina Dimock*
Christina Dimock, WSBA #40159
Assistant United States Attorney
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, Washington  98101
Phone: (206) 553-7970
E-mail:  christina.dimock@usdoj.gov

APPELLANT'S BRIEF - 24
(13-CV-0465-JLR)

1

2

3

**<u>CERTIFICATE OF SERVICE</u>**

4

5

I hereby certify that I am an employee in the Office of the United States Attorney for the

6

Western District of Washington and am a person of such age and discretion as to be competent to

7

serve papers.  I further certify that on this day, I electronically filed the above document with the

8

Clerk of the Court using the CM/ECF system, which will send notification of such filing to the

9

following CM/ECF participant(s):

10

11

Thomas E. Lester                        sherri@lesterhyldahl.com;

12

Lester & Hyldahl                        crashlester@lesterhyldahl.com
Attorney for Kent

13

and Heidi Powell

14

15

I further certify that on this day, I mailed by United States Postal Service the above document

16

to the following non-CM/ECF participant(s)/CM/ECF participant(s), addressed as follows:

17

- 0 -

Dated this 17th day of June, 2013.

18

19

20

  */s/ Laurie A. Gausta*

21

LAURIE A. GAUSTA, Paralegal Specialist
United States Attorney's Office

22

700 Stewart Street, Suite 5220

23

Seattle, Washington 98101-1271
Phone: (206) 553-7970

24

Fax:   (206) 553-4067
E-mail: laurie.gausta@usdoj.gov

25

26

27

28

APPELLANT'S BRIEF - 25
(13-CV-0465-JLR)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

APPELLANT'S BRIEF - 26
(13-CV-0465-JLR)